**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1606-23

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

FARRAKHAN HOWARD, a/k/a
FARRAKHAN S. HOWARD,
HOWARD FARRAKHAN, and
HOWARD S. FARRAKHAN,

    Defendant-Appellant.

_____

Submitted April 28, 2026 – Decided July 23, 2026

Before Judges Susswein and Chase.

On appeal from the Superior Court of New Jersey, Law Division, Union County, Indictment No. 19-07-0435.

Jennifer N. Sellitti, Public Defender, attorney for appellant (David A. Gies, Designated Counsel, on the briefs).

William A. Daniel, Union County Prosecutor, attorney for respondent (Meredith L. Balo, Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

Defendant Farrakhan Howard appeals his November 2022 jury trial convictions for carjacking, attempted murder, aggravated assault with serious bodily injury, and other offenses stemming from an April 24, 2019 incident in which he stabbed his then-girlfriend and the driver of a Lyft vehicle with a screwdriver while riding as a passenger. Defendant fled the scene in the driver's vehicle. He contends the pretrial motion court erred in denying his motion to suppress evidence found in a search incident to his arrest. Defendant also contends that the motion court should have granted an evidentiary hearing regarding the identification procedure police used when they showed one of the victims, his girlfriend, a single photograph rather than an array.

With respect to trial errors, defendant contends that the State failed to prove the elements of carjacking. He also contends that the trial court erred by reading back only a portion of the DNA expert's testimony in response to a jury request, and further erred by not instructing the jurors that they were not to give undue weight to the testimony that was read back to them. Defendant also challenges his sentence, claiming that the trial court erred by imposing what defendant characterizes as the presumptive term for the carjacking offense in violation of his Sixth Amendment rights, and impermissibly double-counted

2

facts related to the elements of the carjacking offense in finding an aggravating factor. After reviewing the record in light of the governing legal principles, we affirm.

I.

We discern the following pertinent facts and procedural history from the record.

Carjacking Incident

In the early morning hours of April 24, 2019, Lyft driver C.F.N.[1] picked up a male and female passenger. When he heard the female passenger scream, C.F.N. stopped the vehicle, believing the male passenger was attacking her. The male passenger then attacked C.F.N. with a heavy object, causing him to bleed.

C.F.N. and the female passenger were able to escape from the vehicle and run from the scene. As he fled from the vehicle, C.F.N. turned around and saw that the male passenger, later identified as defendant, was still inside the vehicle. C.F.N. kept running until he saw a Clark Township marked police vehicle. C.F.N. testified that he believed defendant took the vehicle, since there were no other people at the scene.

---

[1] We use initials to protect the privacy of the victims. R. 1:38(3)(c).

A-1606-23

## Police Response

At approximately 12:49 a.m., a Clark Township police officer observed C.F.N. walking in the middle of the street holding his bleeding neck. C.F.N. told the officer that he was a Lyft driver and that he had been repeatedly struck with an unknown object by a male passenger.

Medics arrived and treated C.F.N. for stab wounds to his head and neck. After he was stabilized, C.F.N. was transported to University Hospital in Newark where medical staff determined that one of the stab wounds had punctured his carotid artery, causing permanent damage. He received seven or eight staples to close his head wounds. He also suffered puncture wounds to the right side of his waist. C.F.N. remained hospitalized for two days.

Minutes before the Clark Township police officers encountered C.F.N., Rahway police responded to a report of a female with multiple injuries. The individual who made the 9-1-1 call reported that he was awoken by banging on his door. He answered the door to a woman bleeding from her head, asking for help. The victim was later identified as the female Lyft passenger, A.S. She reported that she was physically beaten during a Lyft ride to Woodbridge. A.S. was treated for her injuries at Robert Wood Johnson Hospital in Rahway.

A-1606-23

Woodbridge Township police began receiving information about an armed carjacking of a 2010 Honda Odyssey, including a "be on the lookout" (BOLO) describing the possible suspect as a "black male . . . in a gray shirt." Woodbridge police continued to receive information about the incident from Clark police, including that the suspect was armed with a screwdriver or blunt object.

Clark police searched the area for C.F.N.'s vehicle. It was eventually located off the roadway near an exit ramp for the Garden State Parkway. After the unoccupied vehicle was found, Woodbridge police and State police officers canvassed the area.

Arrest and Search Incident

Woodbridge police officers Matthew Dougherty and Khari Manzini were on patrol in an unmarked police vehicle. Officer Dougherty received the following descriptions of the suspect from dispatcher: "a black male in a gray shirt;" "a Hispanic male . . . with a beard, also possibly wearing a black and white shirt;" and "a Hispanic or a black male."

Dougherty testified that he responded to Route 27, driving up and down the highway "three to four times" in search of the suspect. As he drove past a convenience store, Dougherty observed a man inside but noted that there were

5

no cars in the parking lot or other people present. Dougherty testified that the store was about a quarter mile from the exit ramp where the hijacked vehicle was recovered. Dougherty drove a short distance then made a U-turn to return to the store. After performing the U-turn, he observed that the same man inside the store "had darted out across the street into traffic without utilizing a crosswalk." Dougherty saw that the man was carrying "a large, black-colored tote bag that was full of items."

Dougherty testified that he believed he had observed the man commit a violation of N.J.S.A. 39:4-34, jaywalking. Dougherty made another U-turn and approached the man, yelling, "Police, stop," multiple times. Dougherty testified that his intention was to "make enforcement action," "whether it be to write a summons," ask for identification, "or let him go on his way." Dougherty further testified that after the officers issued the command to stop, the man looked back at the officers, was "clearly aware of [their] presence," and began to increase his walking speed. The man then moved the large tote bag from one side of his body to the other. Perceiving that the man was refusing to stop, Dougherty activated the patrol car's emergency lights and exited the patrol car with his partner.

A-1606-23

Dougherty approached the man, later identified as defendant. Dougherty was approximately five to eight feet away from defendant when he observed defendant reach into the black tote bag. Dougherty yelled at him multiple times to stop and show his hands. Defendant ultimately dropped the bag, stopped, and turned towards Officer Dougherty. Dougherty approached defendant and patted him down, believing "he was possibly carrying a weapon" based upon: (1) the description provided by dispatch, (2) defendant's ignoring the officers' commands, and (3) defendant's reaching into the black tote bag. Dougherty placed defendant in handcuffs and searched his person. Dougherty testified that defendant was under arrest at this point for obstructing the administration of the law. Dougherty further testified that he observed blood on defendant's hands or wrists.

After defendant was handcuffed, Dougherty conducted a search of the black tote bag which was "next to [defendant's] feet." Dougherty emptied the contents of the bag onto the sidewalk and recovered a black-and-white striped T-shirt, a dark colored wallet with a woman's ID in it, a screwdriver, a bloody rag, a small amount of marijuana, and an electronic tablet that was smashed. The ID and several credit cards found in the wallet belonged to A.S.

A-1606-23

Subsequent investigation revealed that defendant's DNA was found to be a contributor to the mixture of DNA found on the stolen vehicle's steering wheel and gear shift selector. The bloody rag recovered from the black tote bag was tested for DNA. The DNA results identified the Lyft driver, C.F.N., as the source of the DNA on the rag.

<u>Identification of Defendant by the Victim/Girlfriend</u>

After being released from the hospital, A.S. appeared at the Clark Police Department on April 24, 2019, at 3:33 a.m. to give a statement to Officer Daniel Joy. A.S. told Joy that on April 23rd she worked at a fast-food restaurant from 3:00 p.m. to 11:00 p.m., then went to her parents' house to pick her daughter up and drop her off at her mother-in-law's house. She told Officer Joy that from there, she went to meet defendant at his home on Little Street in Belleville.

A.S. described defendant as her boyfriend and explained to Officer Joy that they were going to a hotel party in Woodbridge. A.S. told Joy that her friend Sharieffa ordered a Lyft to take A.S. and defendant to the party. A.S. told the officer that she and defendant entered the vehicle when the Lyft driver arrived. She stated that she sat in the rear passenger seat, while defendant sat behind the driver, whom she described as "[m]ale, skinny, and Hispanic" with a "short beard." A.S. told Joy that while en route to their destination, upon exiting

A-1606-23

the highway, defendant began attacking her. She explained that he first hit her in the neck with his hands, then proceeded to stab her in the head. A.S. explained that defendant then started stabbing the driver, who stopped the vehicle and opened his door. A.S. stated that she jumped into the front passenger seat and she and the driver fled out of the driver's side door. After escaping from the minivan, she began knocking on doors until someone called 9-1-1.

Officer Joy asked A.S. if she "would know [defendant] by face," to which she responded, "Yes." The officer then showed her a picture and A.S. identified the individual in the photo as her boyfriend. Officer Joy had A.S. sign the photograph indicating that she knew the man in the photograph to be her boyfriend, defendant.

<u>Indictment and Motion to Suppress Physical Evidence</u>

In July 2019, defendant was charged by indictment with first-degree carjacking, N.J.S.A. 2C:15 (count one); first-degree attempted murder, N.J.S.A. 2C:5-1 (count two); first-degree robbery, N.J.S.A. 2C:15-1 (count three); two counts of second-degree aggravated assault, N.J.S.A. 2C:12-1(b)(1) (counts four and five); third-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(d) (count six); fourth-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(d) (count seven); fourth-degree obstructing administration of law,

N.J.S.A. 2C:29-1 (count eight); and fourth-degree receiving stolen property, N.J.S.A. 2C:20-7(a) (count nine).

Defendant moved to suppress physical evidence found in the black tote bag seized after he was stopped on foot by Officer Dougherty. The suppression motion was heard on October 25, 2019, and November 1, 2019.

The State presented testimony from Officer Dougherty. The prosecutor argued that police had reasonable suspicion to stop the defendant not only because he was near the scene of the car crash and matched the description of the carjacking suspect, but also because police observed defendant commit a traffic violation when he failed to use a pedestrian crosswalk to cross Route 27. The State further argued that the search of the tote bag was permissible under the search-incident-to-arrest exception to the warrant requirement. The State maintained that the police had probable cause to arrest defendant, and while he was no longer holding the bag when it was searched, it was still within his immediate control.

Defendant argued that the stop was unlawful because police lacked the requisite reasonable suspicion to justify the stop.

Defendant also argued that police lacked the legal authority to make an arrest. First, defendant argued that the obstruction statute under which he was

10

charged was not violated because defendant merely continued to peaceably walk, rather than flee from police. Defendant further argued that he did not obstruct the administration of law because he did not know that Officers Manzini and Dougherty were police officers, considering they were in an unmarked police car. Moreover, defendant claimed that because he was a pedestrian, not a motor vehicle operator, at the time of his arrest, he could not be charged with obstruction, arguing that N.J.S.A. 39:4-34 does not apply to pedestrians.

On December 9, 2019, the motion court issued a written order and opinion denying defendant's motion to suppress the physical evidence. The court determined that police had reasonable suspicion to stop defendant for violating N.J.S.A. 39:4-34, which prohibits crossing a road outside a crosswalk. The court found Officer Dougherty's testimony that he saw defendant cross Route 27 without using a crosswalk credible. Although surveillance footage presented by the State did not definitively show defendant jaywalking, it corroborated defendant's presence at the location.

The court acknowledged that Officer Dougherty may also have been motivated by the BOLO alert for a suspect matching defendant's description but determined that this did not invalidate the stop. Citing State v. Kennedy, 247 N.J. Super. 21, 28 (App. Div. 1991), the court found that the officer's decision

11

to stop the defendant was objectively supported by the observed traffic violation and thus was justified. The court further concluded that "[w]hile it is an admittedly close case . . . Officer Dougherty had probable cause to arrest [defendant] for Obstruction (N.J.S.A. 2C:29-l) based on his refusal to comply with the Officer's commands after observing him jaywalk across Route 27." The motion court rejected defendant's argument that the offense requires the operation of a motor vehicle.

The motion court also rejected defendant's contention that he did not intend to obstruct the administration of law because he did not recognize the officers in the unmarked police car. The court found Officer Dougherty's testimony credible that defendant repeatedly refused to obey police commands when the officers were feet away from defendant. The court reasoned that these refusals constituted unlawful interference under N.J.S.A. 2C:29-1, providing probable cause for the arrest. The court also determined that the subsequent search of defendant and his bag was lawful, as it was incident to a valid arrest and the bag was within defendant's immediate reach.

<u>Motion to Suppress Identification</u>

Defendant subsequently filed a motion to suppress the out-of-court photo identification made by A.S. Defendant argued that the photo identification

A-1606-23

procedure was inherently suggestive and did not comply with Attorney General guidelines or the standards set forth in State v. Henderson, 208 N.J. 208 (2011). Specifically, defendant objected to the use of a single photo, rather than a photo array, administered by a detective involved in the investigation. Defendant argued that the identification was not merely confirmatory but went to the heart of identifying the perpetrator. Defendant requested a Wade[2] hearing to challenge the reliability of the identification.

The State responded that the identification procedure was not impermissibly suggestive because A.S. already knew defendant and the photo procedure was solely confirmatory. The State emphasized that A.S. had a prior relationship with the defendant, had identified him by name before being shown the photo, and that her identification was reliable based on her familiarity and opportunity to observe him.

On July 20, 2020, the same judge who heard the Fourth Amendment suppression motion issued a written order and opinion denying defendant's motion with respect to the out-of-court identification procedure. The motion court found that A.S.'s identification was confirmatory, as she knew defendant

---

[2] United States v. Wade, 388 U.S. 218 (1967).

A-1606-23

well and had already identified him by name prior to being shown his photo. The court further concluded there was no evidence of suggestiveness that could lead to a mistaken identification; on that basis, it denied defendant's motion to suppress the identification without holding an evidentiary hearing.

Trial

Defendant was tried before a jury over the course of ten nonconsecutive days in late October/early November 2022. At the close of the State's case, defendant moved to dismiss the carjacking charge pursuant to Rule 3:18-1, arguing that "at the time the motor vehicle was removed from the scene . . . there was nobody in the car and nobody around the car and [the Lyft driver] had abandoned the car at that point in time." The trial court—a different judge from the one who heard the pretrial suppression motions—denied the motion to dismiss the carjacking charge, finding that there was sufficient evidence to warrant a conviction for that crime and that the issue needed to be resolved by a jury.

Almost two hours into jury deliberations, the trial court received a jury note asking for the testimony of the DNA expert. Over defense counsel's objection, the trial court asked the jury to identify the particular portion of the expert's testimony needed, rather than read back the entire testimony, which

would have taken an hour and a half.  The jury, by way of another note, responded, "[t]he evidence [regarding] the serology and DNA analysis reports for the steering wheel and gear selector."  Upon reviewing the pertinent transcript, the trial court identified the portion of the expert's testimony it determined to be relevant to the jury's specification, whereupon the court reporter read those portions to the jury.  After that portion of the testimony was read to the jury, no further objections were raised.

The jury ultimately found defendant guilty of carjacking (count one); attempted murder (count two); aggravated assault with serious bodily injury (count four); aggravated assault with significant bodily injury, a lesser-included offense (count five); possession of a weapon for an unlawful purpose (count six); and unlawful possession of a weapon (count seven).  The jury found defendant not guilty of obstructing (count eight) and receiving stolen property (count nine).

Sentencing Hearing

The trial court sentenced defendant on March 3, 2023.  The court determined that aggravating factors one, three, six and nine applied to all counts, and that aggravating factor thirteen applied only to count two, the attempted murder offense.  See N.J.S.A. 2C:44-1(a) (1), (3), (6), (9), (13).  The court noted

that defendant was thirty-one years of age, with a prior indictable crime for theft-by-deception in 2012, a simple assault in 2011, and several juvenile adjudications including simple assault, resisting arrest, and receiving stolen property. The court acknowledged that defendant had not had any encounters with law enforcement since 2011.

As to aggravating factor one—the nature and circumstances of the offense—the trial judge found that that defendant's actions were "completely unprovoked" and resulted in the "life-long" physical, emotional, mental, and financial impairment of the victim Lyft driver. The court explained that aggravating factor one did not involve improper double-counting of the elements for carjacking and attempted murder. The court found that the harm to the victim was so severe that the attempted murder was nearly completed, and the actions taken to commit the murder were sufficiently distinct enough from the carjacking to justify separate charges and sentences.

Regarding aggravating factor three—the risk that the defendant will commit another offense—the court found that defendant's criminal history and lack of remorse expressed during sentencing evinced a risk that defendant would commit further offenses. The court also found that aggravating factor six applied—the extent of the defendant's prior criminal record and the seriousness

16

of the offenses of which the defendant has been convicted—based on defendant's prior criminal history.

With respect to aggravating factor nine—the need for deterrence—the court found "a need to deter [defendant] specifically and very much a need . . . for general deterrence . . . on matters of this nature." Regarding aggravating factor thirteen—use or possession of a stolen vehicle in the commission of a crime—the judge found that factor applicable to the attempted murder conviction but that it could not be "double counted" towards the carjacking conviction.

The trial court determined that the aggravating factors outweighed the mitigating factors and imposed an aggregate twenty-four-year prison term subject to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2. The court noted that while it was starting at the "mid[-]range" of the presumptive term,[3] since the aggravating factors prevailed, a "significant increase [was] warranted in this particular case." The court also determined that the prison term for count five (aggravated assault with significant bodily injury) should be served consecutively to counts one (first-degree carjacking) and two (first-degree

---

[3] Pursuant to N.J.S.A. 2C:15-2, carjacking is a first-degree crime punishable by a term of imprisonment ranging from ten to thirty years, with a mandatory minimum five-year parole ineligibility.

A-1606-23

attempted murder) based on the factors set forth in <u>State v. Yarbough</u>, 100 N.J. 627, 643-44 (1985), and because the crimes were committed against separate victims.

This appeal follows.  Defendant raises the following contentions for our consideration:

> POINT I
>
> DEFENDANT DID NOT INFLICT THE LYFT DRIVER WITH HARM IN THE COURSE OF COMMITTING THE THEFT OF THE HONDA ODYSSEY.
>
> POINT II
>
> THE TRIAL COURT'S READBACK OF PART OF ITS CHARGE TO THE JURY FAILED TO CAUTION AGAINST OVEREMPHASIZING THE TESTIMONY REPEATED.
>
> POINT III
>
> THE MOTION COURT ERRED IN DENYING DEFENDANT'S APPLICATION TO SUPPRESS THE ITEMS FOUND IN THE BLACK TOTE BAG.
>
> POINT IV
>
> THE PRETRIAL IDENTIFICATION PROCEDURE WAS NOT IMPERVIOUS TO POLICE SUGGESTIVENESS.

A-1606-23

POINT V

THE TRIAL COURT IMPROPERLY SENTENCED DEFENDANT WHERE IT NOT ONLY RELIED ON A PRESUMPTIVE TERM, BUT DOUBLE-COUNTED FACTS THAT ESTABLISHED ELEMENTS OF THE CARJACKING OFFENSE TO FIND AGGRAVATING FACTOR ONE APPLIED.

Defendant raises the following contentions in his reply brief:

POINT I

APPELLATE REVIEW OF THE DENIAL OF A MOTION FOR A JUDGMENT OF AQUITTAL UNDER RULE 3:18-1 IS DE NOVO.

POINT II

A MOTION JUDGE'S LEGAL CONCLUSION AND THE CONSEQUEN[C]ES FLOWING FROM THE ESTABLISHED FACTS ARE REVIEWED DE NOVO.

POINT III

DUE PROCESS RIGHTS COMPEL MODIFICATION OF THE HENDERSON TEST FOR RELIABILITY OF AN OUT-OF-COURT IDENTIFICATION WHERE THE STATE MAINTAINS THE IDENTIFICATION WAS THE PRODUCT OF PRIOR FAMILIARITY.

II.

We first address defendant's contention that the State failed to prove the elements of carjacking pursuant to N.J.S.A. 2C:15-2(a)(1) because the Honda

19

Odyssey was abandoned, and because the taking of the vehicle arose from an altercation between defendant and the passenger, not the Lyft driver. More specifically, defendant contends that the State failed to prove that the object of the infliction of harm was to gain control of the vehicle.[4]

We begin our analysis by acknowledging the governing legal principles. A reviewing court applies "the same standard as the trial court to decide if the trial judge should have granted a judgment of acquittal." State v. Sugar, 240 N.J. Super. 148, 153 (App. Div. 1990). A motion for judgment of acquittal will not be granted if:

> [T]he evidence, viewed in its entirety, be it direct or circumstantial, and giving the State the benefit of all of its favorable testimony as well as all of the favorable inferences which reasonably could be drawn therefrom, is sufficient to enable a jury to find that the State's charge has been established beyond a reasonable doubt.
>
> [State v. Fuqua, 234 N.J. 583, 591 (2018) (quoting State v. Kluber, 130 N.J. Super. 336, 341-42 (App. Div. 1974)).]

See also State v. Trinidad, 241 N.J. 425, 457-58 (2020) (applying the above test and concluding "that a reasonable jury could find the defendant guilty of each

---

[4]  We are unpersuaded by the State's assertion that this issue was not raised below and thus must be reviewed for plain error. The record shows that at the close of the State's case, defendant filed a motion for judgment of acquittal to dismiss the carjacking charge, which was denied by the trial court.

A-1606-23

charge"). Conversely, the motion must be granted if the State has failed to prove any one of the elements of the crime. See, e.g., State v. Cuccio, 350 N.J. Super. 248, 257 (App. Div. 2002) (holding that the trial court erred in denying defendant's motion for judgment of acquittal in prosecution for possession of a handgun, where the State "failed to present evidence from which any jury could have found" that the handguns were purchased, acquired, or received in New Jersey).

The carjacking statute provides:

> A person is guilty of carjacking if in the course of committing an unlawful taking of a motor vehicle . . . or in an attempt to commit an unlawful taking of a motor vehicle he:
>
> (1) inflicts bodily injury or uses force upon an occupant or person in possession or control of a motor vehicle.
>
> [N.J.S.A 2C:15-2(a)(1).]

The Model Jury Instructions on carjacking explain that for a jury to find a defendant guilty of carjacking,

> the State is required to prove each of the following elements beyond a reasonable doubt:
>
> 1. that the defendant was in the course of committing an unlawful taking of a motor vehicle;
>
> AND

21

> 2. that while in the course of committing an unlawful taking of a motor vehicle the defendant
>
>> a. knowingly inflicted bodily injury or used force upon an occupant or person in possession or control of a motor vehicle.
>
> [Model Jury Charges (Criminal), "Carjacking (N.J.S.A. 2C:15-2)" (rev. June 13, 2005).]

The Model Jury Charge further provides that "an act is considered to be 'in the course of committing an unlawful taking of a motor vehicle' if it occurs during an attempt to commit the unlawful taking, during the commission of the unlawful taking, or during an immediate flight after the attempt or commission." Ibid. Additionally, "[a]n unlawful taking of a motor vehicle is defined as the taking, operation or exercise of control over the motor vehicle, without consent of the owner . . . with the purpose of either permanently depriving the owner of the motor vehicle or temporarily withholding the motor vehicle." Ibid.

Here, viewing the State's evidence in its entirety and giving the State the benefit of all favorable evidence as well as the inferences that could reasonably be drawn from that evidence, we hold that a jury could reasonably find defendant guilty of carjacking beyond a reasonable doubt. See State v. Reyes, 50 N.J. 454, 458-59 (1967). Accordingly, the trial court's decision to deny defendant's motion for acquittal was not error.

22

Specifically, the jury heard A.S.'s testimony that while she and defendant were in the back passenger seats of C.F.N.'s vehicle, defendant hit A.S. under her neck with his fist and then stabbed her. The jury also heard C.F.N.'s testimony that, upon hearing the altercation occurring behind him, he stopped his vehicle, and defendant then hit the back of his head and stabbed him with a screwdriver. When C.F.N. fled from the vehicle, he turned around and defendant was still inside the vehicle. He testified that he believed defendant took the minivan, since there were no other people at the scene. The vehicle was ultimately recovered unoccupied on the Woodbridge exit ramp, which according to Officer Dougherty's testimony, was a quarter mile from the area where defendant was later observed.

The State also presented evidence that defendant's DNA was found to be a contributor to the mixture of DNA found on the Honda Odyssey's steering wheel and gear selector. The DNA results presented also determined that C.F.N.'s DNA was found on the bloody rag recovered from defendant's tote bag.

Based on the testimony from the witnesses, the DNA evidence found on the steering wheel and gear selector, and the bloody rag, the jury could reasonably conclude that defendant committed a carjacking when he inflicted bodily injury on C.F.N. in the course of unlawfully taking his vehicle. After

23

defendant stabbed A.S. and the vehicle was put into park gear, instead of running from the scene, defendant decided to stab the driver. A jury could reasonably draw the conclusion from this evidence that defendant stabbed C.F.N. so that he could take the minivan to facilitate his escape from the crime scene. In sum, the State successfully proved all elements of N.J.S.A 2C:15-2(1)(a) and a jury could reasonably find defendant guilty of carjacking beyond a reasonable doubt. See Reyes, 50 N.J. at 458–59.

## III.

We next address defendant's contentions regarding the readback of the DNA expert's testimony. The jury had sent a note requesting to hear a readback of the testimony and defense counsel had requested that they hear the witness's entire testimony. Defendant on appeal contends that besides providing only a truncated readback, the trial court erred by not giving a cautionary instruction for the jurors not to give undue weight to the testimony that was read back to them.

## A.

We first address defendant's contention that the court erred by providing only a limited readback. Following the jury's initial inquiry, the trial court expressly told them that it was "more than willing" to have the court reporter

read back the entire testimony, including "direct examination and cross examination." The trial court further instructed the jury that alternatively, the court reporter could read back "a specific area" if the jury could sufficiently identify it, and that "the breadth or scope of the readback" sought was solely for the jury to decide.

In response, the jury's second note specified that they wanted to hear "[t]he evidence [regarding] the serology and DNA analysis reports for the steering wheel and gear selector." The trial court thereupon reviewed the transcript and selected the passages from the expert's testimony it determined to be relevant to the jury's request.

"It is well-established that 'the reading of all or part of the testimony of one or more of the witnesses at a trial, criminal or civil, at the specific request of the jury during their deliberations is discretionary with the trial court.'" State v. Wilson, 165 N.J. 657, 660 (2000) (quoting State v. Wolf, 44 N.J. 176, 185 (1965)). "[A]s a general rule, if a jury requests a readback of the testimony of a witness, the readback should include both direct and cross-examination." Ibid. However, "[t]hat is not to suggest that a witness's entire testimony is required to be read back in every single case." Id. at 661. Our Supreme Court explicitly stated that "[t]rial judges nonetheless retain discretionary authority to try to

25

narrow a jury's request if it calls for the playback of extensive testimony." State v. Miller, 205 N.J. 109, 122-23 (2011).

Here, although the portions of the expert's testimony read back for the jury did not include cross-examination pursuant to the general rule set forth in Wilson, 165 N.J. at 660, the trial court "nonetheless retain[ed its] discretionary authority" to limit the DNA expert's testimony to the relevant portions requested by the jury, particularly considering that the entire testimony was over an hour and a half long. See Miller, 205 N.J. at 122-23.

Review of the portions of testimony read back to the jury shows that the trial court's ruling was responsive to the jury's request as clarified in their second note. Notably, moreover, the jury did not send a subsequent note requesting additional readback testimony, despite being expressly told by the trial court that they had the authority to dictate what was read back. We add that if the entire testimony had been read back as defense counsel requested, the jury would have once again heard that the DNA found on the bloody rag contained C.F.N.'s DNA, further incriminating defendant.

In sum, we see no error in the trial court's decision to ask the jury to be more specific in its request for a readback. Nor do we see any basis for appellate intervention with respect to the manner in which the trial court carefully

A-1606-23

reviewed the expert's testimony to determine what portions were relevant to the jury's request.

B.

We turn to whether the court erred by not sua sponte issuing a specific instruction cautioning the jury not to give undue weight to the read back testimony. Defendant argues on appeal that "[w]ithout reminding the jurors not to overemphasize the scientific analysis regarding what constitutes contact DNA, the expert testimony read back had a clear capacity to produce an unjust result." We review defendant's contention regarding the cautionary instruction for plain error because defendant did not ask for that instruction and did not object when the court did not sua sponte provide one.

We are unpersuaded by defendant's contention that the issue regarding the cautionary instruction was "partially" raised below because defense counsel requested that the entire testimony be read. We are satisfied that there was no specific objection regarding the need for a cautionary jury instruction, either before or after the testimony was read back to the jury. See R. 1:7-2 (the contemporaneous objection rule). Accordingly, defendant's contention should be reviewed under a plain error standard. See State v. Gonzalez, 249 N.J. 612, 633 (2022) ("When a defendant does not object to an alleged error at trial, such

error is reviewed under the plain error standard." (quoting State v. Singh, 245 N.J. 1, 13 (2021))). The plain error standard "requires reversal only for errors 'of such a nature as to have been clearly capable of producing an unjust result.'" State v. Cotto, 471 N.J. Super. 489, 544 (App. Div. 2022) (quoting Trinidad, 241 N.J.at 451; R. 2:10-2). But regardless of whether the standard of review is plain error or harmless error, we conclude that the expert readback provides no basis to reverse the jury verdict, especially considering that the culprit's identity was established by the identification made by the victim—defendant's girlfriend.

We note that "an 'alleged error is viewed in the totality of the entire charge, not in isolation,' and 'any finding of plain error depends on an evaluation of the overall strength of the State's case.'" Ibid. (quoting State v. Nero, 195 N.J. 397, 407 (2008)). "The mere possibility of an unjust result is not enough." Ibid. (quoting State v. Alexander, 233 N.J. 132, 142 (2018)). "Rather, '[t]he possibility must be real, one sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached.'" Alexander, 233 N.J. at 142 (alteration in original) (quoting State v. Macon, 57 N.J. 325, 336 (1971)). See also State v. Butler, 263 N.J. 2, 22 (2026) (explaining that reversal is warranted under the plain error standard where "an error [is] sufficient to raise a reasonable doubt as to whether the error led the jury to a

result it otherwise might not have reached" (emphasis added) (quoting State v. Funderburg, 225 N.J. 66, 79 (2016))).

We are aware of no case establishing a categorical rule that requires a court to give a supplemental cautionary instruction regarding readback testimony in the absence of a defense request. Defendant relies on Miller for the proposition that trial judges are required to instruct the jurors at the time the testimony is repeated "to consider all of the evidence and not give undue weight to the testimony played back." 205 N.J. at 123. However, Miller is distinguishable from the case before us. In Miller, the Court was concerned with video playbacks of witness testimony in light of the increased use of digital recording equipment in trial courts. Id. at 120-22. Thus, the Court offered "certain guidelines for the playback of video testimony." Id. at 122. Here, however, the testimony was merely read back by the court reporter, and the specific concerns related to video playbacks do not apply. See id. at 121 ("To be sure, playing back recorded testimony reveals more than a sterile read-back does. A video playback enables jurors not only to recall specific testimony but also to assess a witness' credibility . . . .").

Here, defendant cannot demonstrate that failing to instruct the jury not to give undue weight to the readback testimony led to a result that it otherwise

might not have reached. See Gonzalez, 249 N.J. at 633 (2022) (quoting Singh 245 N.J. at 13). The State at trial presented overwhelming proof that defendant was the person who stabbed the two victims, including testimony from both A.S. and C.F.N. that defendant attacked them while in the Honda Odyssey, along with testimony from Officer Dougherty that the vehicle was recovered a quarter mile from where he encountered defendant. Although the very fact that the jury asked to hear a readback of the DNA expert's testimony shows that evidence was important to their deliberations—and while the preferred practice is to provide a cautionary instruction whenever testimony is read back—we believe issuing such an instruction in these circumstances would not have changed the result. We therefore decline to overturn the verdict on these grounds based on the record before us.

IV.

Defendant next contends that the motion court erred in denying his motion to suppress the physical evidence found in the black tote bag because (1) the investigatory stop was unconstitutional, and (2) police did not have probable cause to arrest him, eliminating the required predicate for the search of the bag under the search-incident-to-arrest exception to the warrant requirement.

"Appellate courts reviewing a grant or denial of a motion to suppress must uphold the factual findings underlying the trial court's decision so long as those findings are supported by sufficient credible evidence in the record." State v. Lamb, 218 N.J. 300, 313 (2014) (citing State v. Elders, 192 N.J. 224, 243 (2007)). Deference is accorded to those factual findings because they "are substantially influenced by [an] opportunity to hear and see the witnesses and to have the 'feel' of the case, which a reviewing court cannot enjoy." Elders, 192 N.J. at 244 (quoting State v. Johnson, 42 N.J. 146, 161 (1964)). "Thus, appellate courts should reverse only when the trial court's determination is 'so clearly mistaken that the interests of justice demand intervention and correction.'" Lamb, 218 N.J. at 313 (quoting Elders, 192 N.J. at 244).

Turning to substantive search and seizure principles, "[t]he Fourth Amendment of the United States Constitution and Article I, Paragraph 7 of the New Jersey Constitution protect against 'unreasonable searches and seizures' by government officials." State v. Watts, 223 N.J. 503, 513 (2015). "[T]he proper inquiry for determining the constitutionality of a search-and-seizure is whether the conduct of the law enforcement officer who undertook the search was objectively reasonable." Id. at 514 (quoting State v. Bruzzese, 94 N.J. 210, 219 (1983)). The reasonableness of police conduct is assessed based upon an

objective viewing of the officer's actions "considering the circumstances confronting [the officer] at that time." State v. Barrow, 408 N.J. Super. 509, 518 (App. Div. 2009). Importantly for the purposes of this appeal, the State bears the burden of proving by a preponderance of the evidence that a warrantless search or seizure falls within one of the recognized exceptions to the warrant requirement. State v. Amang, 481 N.J. Super. 355, 375-76 (App. Div. 2025). We proceed to dissect the sequence of events leading to the seizure of the evidence found in the tote bag, proceeding one step at a time, starting with the initial stop, the escalation to an arrest, and the ensuing search of the bag incident to that arrest.

A.

"It is undisputed that a police officer may conduct an investigatory stop of a person if that officer has 'particularized suspicion based upon an objective observation that the person stopped has been or is about to engage in criminal wrongdoing.'" State v. Coles, 218 N.J. 322, 343 (2014) (quoting State v. Davis, 104 N.J. 490, 504 (1986)). "'Reasonable suspicion' means that 'the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion.'" Barrow, 408 N.J. Super. at 517 (quoting Terry v. Ohio, 392 U.S. 1, 21 (1968)).

32

See also Coles, 218 N.J. at 343 ("The stop must be reasonable and justified by articulable facts; it may not be based on arbitrary police practices, the officer's subjective good faith, or a mere hunch.").

"Determining whether reasonable and articulable suspicion exists for an investigatory stop is a highly fact-intensive inquiry. . . ." State v. Nyema, 249 N.J. 509, 528 (2022). It requires evaluation of the totality of circumstances surrounding the police encounter, weighing the government's need to enforce the law against the person's right to be free from unwarranted police intrusion. Ibid.

"Investigatory stops are valid in situations where the objective basis for the stop was a minor traffic infraction." Barrow, 408 N.J. Super. at 518. "The State need not prove that the suspected motor vehicle violation has in fact occurred, only that the officer had a reasonable, articulable and objective basis for justifying the stop." Ibid. Furthermore, "[t]he fact that the justification for the stop was pretextual . . . [is] irrelevant." Ibid. (second alteration in original) (quoting State v. Kennedy, 247 N.J. Super. 21, 29 (App. Div. 1991)).

Here, the motion court made the following findings in its written suppression decision:

> [T]he police had reasonable suspicion to stop the [d]efendant for a violation of N.J.S.A. 39:4-34, which

makes it unlawful for an individual to cross in the middle of a road where a crosswalk is provided. Officer Dougherty testified credibly that he personally observed the [d]efendant cross Route 27 without utilizing a crosswalk. This testimony is bolstered by the surveillance footage from 7/11 on that night, as the [d]efendant can be seen entering the road just before patrol vehicles 22 and 103 enter camera view. While it is not entirely clear from the footage that the [d]efendant did not utilize the crosswalk, the footage does corroborate the officer's testimony by placing the [d]efendant at the location where the officer claimed to have seen him cross Route 27. This, on its own, justifies the investigatory stop, or attempted investigatory stop, of the [d]efendant.

The motion court further recognized that the officer "may have decided to stop the [d]efendant in part, or even primarily because he suspected that the [d]efendant was the subject of the recently issued BOLO." However, the court, citing <u>Kennedy</u>, 247 N.J. Super. at 28, recognized that pretextual stops are lawful as long as the facts, viewed objectively, justify the officer's actions.

The motion court found that, viewed objectively, the facts known to Officer Dougherty at the time justified the stop. After observing a violation of N.J.S.A. 39:4-34, jaywalking, in his presence, Dougherty conducted the stop to identify the defendant and determine whether to issue a warning or a summons, ultimately choosing the latter. There is sufficient, indeed ample credible evidence in the record to support the motion court's factual findings, and its

conclusion that the stop was lawful should not be disturbed. See Lamb, 218 N.J. at 313 (explaining that an appellate court must defer to a trial court's factual findings on a motion to suppress and uphold them so long as they are supported by sufficient credible evidence in the record).

B.

We turn next to defendant's contention that there was no probable cause to arrest him, and therefore no lawful basis to conduct a search incident to the arrest. We again begin by acknowledging the governing legal principles. A search that is conducted incident to a lawful arrest is a well-established exception to the warrant requirement. See State v. Torres, 253 N.J. 485, 503 (2023) (citing Chimel v. California, 395 U.S. 752, 762-63 (1969)); State v. Dangerfield, 171 N.J. 446, 461 (2002). The search-incident-to-arrest exception "requires that there be probable cause to arrest." Dangerfield, 171 N.J. at 456. "Probable cause exists if at the time of the police action there is 'a well grounded suspicion that a crime has been or is being committed.'" Ibid. (quoting State v. Sullivan, 169 N.J. 204, 211 (2001)).

With respect to the scope of a search incident to arrest, "the exception allows 'the arresting officer to search' both 'the arrestee's person and the area "within [their] immediate control"'" in order to prevent the arrestee from

35

obtaining a weapon or destroying evidence." State v. Lentz, 463 N.J. Super. 54, 69 (App. Div. 2020) (quoting Chimel, 395 U.S. at 763). The authority to search a person incident to a lawful arrest—although grounded in the need to disarm the suspect and prevent the destruction of evidence—does not depend on a court's later assessment of the likelihood that weapons or evidence would actually be found. Id. at 70. Rather, because a custodial arrest based on probable cause is itself a reasonable intrusion under the Fourth Amendment, a search incident to that arrest requires no additional justification; the lawful arrest alone establishes the authority to conduct a full search of the person. Ibid.

Furthermore, "[t]he authority to search an arrestee and the area within [their] immediate control includes the authority to search a container found in the arrestee's possession." State v. Oyenusi, 387 N.J. Super. 146, 154 (App. Div. 2006). Even when a suspect is handcuffed, the search of a container in their possession at the time of the arrest is still permissible. See id. at 155 ("[T]he fact that the police seize a container in the possession of an arrestee at the time of the arrest, thereby depriving the arrestee of access, does not mean that a warrant must be obtained before the container can be opened and examined.").

Here, the motion court found that "[w]hile . . . an admittedly close case

. . . Officer Dougherty had probable cause to arrest the [d]efendant for Obstruction (N.J.S.A. 2C:29-1) based on his refusal to comply with the Officer's commands after observing him jaywalk across Route 27."

The motion court—responding to defendant's argument that the police did not have legal authority to arrest him for obstructing the issuance of a Title 39, jaywalking ticket because he was a pedestrian, not operating a vehicle—found that N.J.S.A. 39:4-34, failure to use a crosswalk, does not require that the offender be operating a motor vehicle. The motion court also rejected defendant's argument that he was not obstructing because he did not know Dougherty and Manzini were police officers given that they were in an unmarked police car. The motion court gave "great weight to Officer Dougherty's testimonial illustration of the event." Specifically, the court found:

> [Officer Dougherty] explained with confidence that he was only [fifteen] feet from the [d]efendant when he and Officer Manzini yelled "stop" and identified themselves as police officers several times, until eventually Officer Dougherty stopped his vehicle, activated his emergency lights, then he and Officer Manzini continued to approach the [d]efendant while still shouting commands at him to stop. At this point, the [d]efendant is now looking at two Officers; at least one of whom was in full uniform, as they yell for him to stop. According to Officer Dougherty, the [d]efendant turned away from him and began to rifle through his bag. The [d]efendant continued to do this

37

> while ignoring the Officers' numerous commands to stop and show them his hands.

The court, relying on State v. Lashinsky, 81 N.J. 1, 11 (1979), determined that defendant's refusal to obey the officers' orders constituted "interference" within the meaning of N.J.S.A. 2C:29-1, obstructing the administration of law. The motion court concluded that probable cause existed justifying defendant's arrest.

Turning to the scope of the search, the motion court found that "the bag was certainly within [d]efendant's immediate reach at the time he was arrested, as it was at his feet." Further, the court noted that the search occurred contemporaneous to the arrest, and the fact that defendant was already handcuffed before the bag was searched did not invalidate the search.

We agree with the motion court's careful and methodical reasoning and affirm substantially for the reasons expressed in the court's written decision. The officer conducted a lawful investigatory stop after observing defendant commit a Title 39 offense. Probable cause ripened when defendant refused to obey the officer's lawful command to stop, providing a lawful basis to believe defendant was committing the offense of obstruction of administration of law. That probable cause justified the arrest, thereby entitling the officers to conduct a warrantless search of defendant's person and containers within defendant's wingspan, including the tote bag at defendant's feet. Proceeding step-by-step

through the sequence of police actions and decisions, as the motion court correctly ruled, police at all times complied with defendant's Fourth Amendment rights.

V.

Defendant next argues that the motion court should have granted an evidentiary hearing regarding the identification procedure used by Detective Joy when he showed A.S. a single photograph of defendant. First, defendant argues that this identification was inherently suggestive because a single photo, rather than an array, was used. Defendant further argues that this procedure did not conform with any of the "system variables" announced in <u>Henderson</u>, 208 N.J. at 208. Finally, defendant asserts that in denying an evidentiary hearing on this issue, the trial court deprived defendant of an opportunity to fully explore the familiarity of the relationship between himself and A.S., which he argues could have aided his defense. None of these contentions have merit.

Deference is accorded to a trial court's determination that photographic identification procedures were reliable. <u>See</u> <u>State v. Adams</u>, 194 N.J. 186, 203 (2008) ("[T]he trial court's findings that photographic identification procedures were reliable should not be disturbed if there is sufficient credible evidence in the record to support the findings."). Furthermore, "to obtain a pretrial hearing,

39

a defendant has the initial burden of showing some evidence of suggestiveness that could lead to a mistaken identification." Henderson, 208 N.J. at 288. The Court in Henderson set forth a list of non-exhaustive "system variables" that should be considered in evaluating whether evidence of suggestiveness exists as to warrant a hearing. Id. at 289-90. System variables are relevant circumstances within the State's control, including: (1) Blind Administration; (2) Pre-identification Instructions; (3) Lineup Construction; (4) Feedback; (5) Recording Confidence; (6) Multiple Viewings; (7) Showups; (8) Private Actors; and (9) Other Identifications Made. Ibid. While a court may consider "estimator variables"—factors beyond the control of the criminal justice system—at a pretrial hearing, only system variables can trigger a pretrial hearing. Id. at 293. The Court in Henderson emphasized that "enhanced hearings are not meant to be the norm in every case," and that "[t]hey will only be held when defendants allege some evidence of suggestiveness." Id. at 303.

We first consider defendant's contention that that the detective improperly displayed a single photograph to A.S., rather than array. Our Supreme Court has acknowledged that "[p]olice will, on occasion, display a single photograph to a witness in an effort to confirm the identity of a perpetrator. Police typically limit this method to situations in which the perpetrator is previously known to

A-1606-23

or acquainted with the witness." State v. Pressley, 232 N.J. 587, 593 (2018) (quoting National Research Council, Identifying the Culprit: Assessing Eyewitness Identification 28 (2014)). So-called "confirmatory" identifications are "not considered suggestive." Id. at 592.

Here, the motion court determined that A.S.'s identification of defendant was a reliable confirmatory identification. We agree. Specifically, the motion court found that defendant and A.S. had been dating for three months and may have known each other for "much longer," based on her statements to Detective Joy. The motion court further highlighted that A.S. referred to her attacker as "Farrakhan" or "Farrakhan Howard" several times throughout her police interview, prior to being shown defendant's photograph. Further, the motion court noted that the friend A.S. referred to as having occasionally ordered her Lyft rides—Shareiffa—was defendant's mother, Shareiffa Howard, who A.S. referred to as her "mother-in-law" in her statement to Detective Joy. In sum, the motion court correctly determined that defendant's photo served only to confirm her verbal identification of him.

The motion court further concluded that defendant had failed to demonstrate "some evidence of suggestiveness that could lead to a mistaken identification." As our Supreme Court stressed, "reliability is the linchpin in

41

determining the admissibility of identification testimony." Henderson, 208 N.J. at 238 (quoting Manson v. Brathwaite, 432 U.S. 98, 114 (1977)).  We affirm the motion court's decision to deny defendant's motion without an evidentiary hearing because the court's determination that the procedure was reliable is supported by sufficient credible evidence in the record.  See Adams, 194 N.J. at 203 ("[T]he trial court's findings that photographic identification procedures were reliable should not be disturbed if there is sufficient credible evidence in the record to support the findings.").

Here, considering the totality of relevant circumstances, we do not hesitate to conclude that the out-of-court identification of defendant by his girlfriend was reliable and properly admitted.  Indeed, this case falls squarely in the heartland of cases where an evidentiary Wade/Henderson hearing is not needed and would be a waste of time.

## VI.

Finally, we address defendant's sentencing arguments.  Defendant contends that the trial judge (1) improperly sentenced him to what once was known as the "presumptive" term related to the carjacking offense and (2) impermissibly double-counted facts related to the elements of the carjacking

42

offense to find aggravating factor one, N.J.S.A. 2C:44-1(a)(1), the nature and circumstances of the offense, applied. We address each contention in turn.

It is axiomatic that appellate courts apply a deferential standard of review to sentencing determinations and "must not substitute [their] judgment for that of the sentencing court." State v. Fuentes, 217 N.J. 57, 70 (2014). The sentence must be affirmed unless:

> (1) the sentencing guidelines were violated; (2) the aggravating and mitigating factors found by the sentencing court were not based upon competent and credible evidence in the record; or (3) "the application of the guidelines to the facts of [the] case makes the sentence clearly unreasonable so as to shock the judicial conscience."
>
> [Ibid. (quoting State v. Roth, 95 N.J. 334, 364-65 (1984)).]

In State v. Natale, our Supreme Court, relying on Sixth Amendment principles announced in Apprendi v. New Jersey, 530 U.S. 466 (2000), Blakely v. Washington, 542 U.S. 296 (2004), and United States v. Booker, 543 U.S. 220 (2005), eliminated the presumptive terms codified in the penal code. 184 N.J. 458, 487-88 (2005). The Court further held that "[a]lthough judges will continue to balance the aggravating and mitigating factors, they will no longer be required to do so from the fixed point of a statutory presumptive [term]." Id. at 488. The Court stressed, however, that a reasonable approach would be for judges to "pick

the middle of the sentencing range as a logical starting point for the balancing process."  Ibid.  The Court anticipated that when the aggravating factors outweigh the mitigating factors, sentences would lean towards the higher end of the sentencing range.  See ibid. ("[R]eason suggests that when the mitigating factors preponderate, sentences will tend toward the lower end of the range, and when the aggravating factors preponderate, sentences will tend toward the higher end of the range.").

Here, the trial court determined that the aggravating factors outweighed the mitigating factors and imposed an aggregate twenty-four-year prison term subject to NERA.  The court noted that while the sentence started at the "mid range"—the former presumptive term for carjacking—the aggravating factors prevailed, warranting a "significant increase . . . in this particular case."  We conclude the sentence imposed was entirely appropriate in light of the Court's instructions in Natale, 184 N.J. at 488.  Indeed, the trial court followed precisely the decision-making framework deemed to be reasonable in Natale.

Turning to defendant's second sentencing argument, we address whether the trial court impermissibly double-counted the elements of the carjacking offense in finding that aggravating factor one applied.  Aggravating factor one addresses "the nature and circumstances of the offense, and the role of the actor

44

in committing the offense, including whether or not it was committed in an especially heinous, cruel, or depraved manner." N.J.S.A. 2C:44-1(a)(1).

The law is well-settled that "a court may identify competent, reasonably credible evidence that the defendant's offense was 'committed in an especially heinous, cruel, or depraved manner,' or that the evidence otherwise justifies application of aggravating factor one, without double-counting the elements of the offense." Fuentes, 217 N.J. at 77 (quoting N.J.S.A. 2C:44–1(a)(1)). Such a determination "must be fully grounded in the record before the sentencing court," and the court must "adequately explain its application of aggravating factor one." Ibid.

Here, the trial court found that the nature and circumstances of the case demonstrated that defendant's actions were "completely unprovoked" and resulted in the life-long physical, emotional, mental, and financial impairment of the Lyft driver, the victim of the carjacking crime. The trial court expressly recognized the rule against double-counting, explicitly stating that its consideration of aggravating factor one did not involve double-counting of the elements for carjacking and attempted murder, reasoning the harm to the victim was so severe that the attempted murder was nearly completed. We agree that the severity of defendant's unprovoked attack far exceeded the level of force and

harm required to support a carjacking conviction and an attempted murder conviction. The trial court's application of aggravating factor one was thus "fully grounded in the record" and "adequately explain[ed]." Ibid.

To the extent we have not specifically addressed them, any remaining arguments raised by defendant lack sufficient merit to warrant discussion. R. 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Hanley

Clerk of the Appellate Division